So the first court case on our docket is the people of the state of Illinois v. Dennis Edwards, and Mr. Edwards is here for the appellant, and Mr. Camden for the athlete. You may begin, Mr. Edwards. You may please report, Justice Cates. My name is Dan Edwards. I'm an attorney with the state appellate defender here in Mount Vernon, representing Mr. Edwards. Mr. Edwards was convicted of unlawful possession of a weapon by a felon. In our brief, we raised three issues. First one, whether he was prejudiced by other crimes evidence presented to the jury. An effective assistance counsel, and a reasonable doubt argument. I'll essentially talk about issue number one, the other crimes evidence, unless your honors have some questions about the other two. The evidence against Mr. Edwards is really very straightforward. It comes from Stephanie Jones, who was the mother of his 29-year-old daughter, Denise, his paramour. They had been living together for about six months when Denise directed the police to go talk with her mother, Stephanie Jones, where Jones told them that the defendant, Mr. Edwards, had a handgun hidden in her residence and she wanted them to get it out. They arrested him and in a search of a bedroom closet, they found a handgun wrapped in a black towel and a black bag in the closet. The only evidence tying Mr. Edwards to this gun is Jones' testimony. We saw him place that gun in the black bag and it was his gun. No other witnesses tie him to the gun and no other evidence ties him to the gun. This case was interesting because it had two trials. In the first trial, the jury was unable to come to a verdict. It was a hung jury and one of the reasons I would believe is because this evidence of prior bad acts and other crimes was not allowed into that jury trial. The state wants to argue that the cross-examination of Jones and her strange kind of lifestyle with the defendant, Mr. Edwards, allowed them to bring in this other crimes evidence. We argue that the cross-examination should not have been considered the opening the door or curative admissibility. What was brought in was threats made by Mr. Edwards from the jail. Jones testified that he had gone back to his old ways of smoking crack, stealing and running around, that Mr. Edwards had hit Jones. It culminated eventually in Jones testifying that he fondled his own kid in fear that he would do the same to her grandchildren. The doctrine of curative admissibility is not a panacea. It does not permit a party to introduce inadmissible evidence merely because the opponent brought out some evidence on the same subject. That's from an Illinois Supreme Court case of People v. Manning and what I find very interesting about Manning is that it cites to People v. Chambers, which we also cite in our brief. They note in Manning and in Chambers that curative admissibility is limited in scope and design to those situations where its invocation is deemed necessary to eradicate undue prejudicial inferences. Now, the only undue prejudice to the state's case put forward by the state is that there are witnesses that credibility was being attacked. But credibility is a very important part of every trial and it does not and should not be allowed to be used to paint the defendant with such a broad brush of inadmissible other crimes evidence. In Chambers, the court allowed the state's witness to testify to threats made by the defendant from the jail. The witness was allowed to testify that he was being threatened from the jail by the defendant. The court noted that the trial court incorrectly admitted the testimony based on the doctrine of curative admissibility and therefore used its discretion. And I really find very important language in Chambers, the language that it was used under the guise of rehabilitation. And I believe that that is exactly what occurred in this case, that the state brought forth this testimony in the guise of rehabilitation simply to paint the broad brush of prejudice on the defendant about these other crimes evidence. There was some pretty damaging evidence brought in by his own attorney, however, wasn't there? And that's noted in our second argument about ineffective assistance counsel. And that is in terms of the trial going overboard, but they were engaged in this debate about how much of this evidence was going to be brought in and what was going to be admissible. And then she did bring out this, but it all was based upon the state's wanting to bring in the other crimes evidence. To the extent that trial counsel did bring it out, I think that is simply ineffective assistance counsel and that there was no valid trial strategy to allow that evidence be brought in. That evidence is very explosive and damaging and why she would do that, I'm not quite sure. Let me just ask, the defense strategy on cross-examination was to show that Jones was biased and therefore she set him up, or at least make that argument. And some of this other information that was brought out would also show bias, although it's damaging to the defendant too. That's right. And in terms of that, the ball started rolling down the hill and it was really hard to stop after that begins. But in terms of the bias, there would be no need to really do that besides the erroneous ruling of allowing in some of this other crimes evidence in the first place. The danger of other crimes evidence is well understood. It was found to be improper and not admissible by the circuit court at the beginning of the trial. And we would urge your honors to find that it was just not right and the defense did not open the door to have it be brought in. What do you think should have been allowed in as curative? Well, I don't think any of the five things that I noted earlier. Which are the domestic abuse, the… Chambers definitely demonstrates that threats from the jail are not to be brought in. Going back to his old ways, I mean, that was 30 years ago. And that is not something that should have been allowed in. And that Mr. Jones had hit Edwards. Mr. Edwards had hit Jones at some point during their relationship. That was just irrelevant. It all gets down to the state has to take its witnesses as they are. And their lifestyle was kind of strange. That's just something that they have to, well, accept and put up with. Consequently, your honors, we would urge you to reverse and remand for a new trial. Thank you, Mr. Edwards. You'll have the opportunity to do that. Ms. Candid? May it please the court. Counsel. Good morning. Good morning, Justice Gaines. Good morning. I'm Jennifer Candid on behalf of the state. This was a simple case. And the defense's only chance was to damage Jones' credibility. And this it attempted to do during its cross-examination of Jones by painting her as a woman scorned, a woman angry about the defendant's dalliance with another woman, Ms. Brooks. I can't imagine, though, painting a more negative picture of the defendant by allowing in stealing, smoking, crack, domestic abuse, sexual abuse, past and potentially future as a trial strategy. Well, your honor, does your question relate to ineffective assistance of counsel argument? Yes, I'm more interested in that. Okay. Well, I think the record shows that the counsel modified her trial strategy after Jones' testimony on redirect. And when you look at the re-cross-examination of Jones, the evidence that came out was that Jones was not able to say when this alleged molestation occurred, that she continued to allow the defendant to remain around her daughter. I think this went to the impossibility, the defense argued, of Jones' explanation, that she could prevent harm to her grandchildren by permitting the defendant to live with her. The trial strategy was to paint Jones as someone who hated the defendant so much that her credibility on the question of whether the gun belonged to him could not be believed. When you look at the closing argument by defense counsel, you see that that is the argument that defense counsel made, that all that the state's redirect had shown, defense counsel argued, was that there were additional motivations that Jones had for setting the defendant up, which was the defense's overarching defense strategy. This trial strategy decision is inappropriate for review as an effective assistance of counsel unless there was no meaningful adversarial testing of the state's case. And I'd submit that this attack on Jones' credibility did constitute meaningful adversarial testing of the state's case. The defense counsel asked a series of rhetorical questions in closing argument, why did she hate the defendant, what was her motivation here, did she set him up, etc. And the defense argued that she had an agenda. And I think that's the trial strategy that defense counsel sought to pivot to after the state's redirect. Moving back to issue one, defendant here today suggests that the hung jury in the first trial shows the prejudice from this evidence. But I submit that it shows that the jury in the first trial was confused because it got half the story. There was no reasonable probability of acquittal if this evidence had not been introduced at the second trial. After all, it wasn't introduced at the first trial and the defendant wasn't acquitted. The jury did not have the tools at the first trial that it needed in order to assess Jones' credibility. It received at the first trial only vague and impossible to comprehend answers to why Jones permitted the defendant to move back into her apartment. She said only, she was allowed to say only that she permitted him to move back into her apartment on her family's behalf. After denying several times that she did not intend to rekindle a romantic relationship, that that was not her motive. She wasn't allowed to say precisely what her motive was. In the second trial, the rest of the story was permitted to be told. And each of the categories of evidence that the defendant attacks here on appeal were responsive to particular half-truths and false insinuations that defense counsel planted on cross-examination. And I would like to also note that the statement by Jones, he fondled his own kid, came out not on redirect examination. This was not part of the other crimes or bad acts evidence that the defendant is challenging here today. Rather, it came out on recross examination. All that Jones said on redirect examination was that she allowed him to move into her home to watch him around her grandchildren. That she wanted to keep an eye on him if he was going to be around her grandchildren. And that's an important distinction to make here. And of course, this evidence was intended to rebut the false impression planted on cross-examination that she allowed him to move into her home to rekindle a romantic relationship. And this was part of the defense's strategy to show that Jones' love for the defendant, and this is from defense's opening statement, burned both strong and hot. And that she was driven by jealousy upon news of his dalliance with Ms. Brooks, a woman, to plant this gun. Regarding the threats from the jail, the impression planted by the defense on cross-examination was that she discarded or destroyed his property in a jealous rage because he had cheated on her. When she testified on cross-examination that some of his property from his apartment had not been returned to him upon his arrest. Defense counsel asked several times on cross-examination, did you give it to Ms. Brooks? So after you had him arrested, you destroyed his property. The impression sought to be created was that she did this motivated by romantic jealousy. And then on redirect, she was permitted to explain the reason why some of his property was abandoned, which was that he threatened her from jail and she had to leave her apartment quickly, she explained. So the state was allowed then to rebut this defense strategy of planting a half-truth by introducing the rest of the story. And the same is true for Jones' testimony about his old ways. On cross-examination, she testified that after he moved back into her apartment, he went back to his old ways. Defense counsel asked, by his old ways, do you mean running around on you with Ms. Brooks? She said no, but it wasn't until redirect that she was allowed to explain what his old ways were, and that's the smoking crack and stealing. I would point out that with regard to the stealing, she had testified on cross-examination, the original cross-examination, that he'd been stealing from her. So I question whether this is really new evidence of other crimes or bad acts that was brought out on redirect by the state, or whether that is evidence originally brought out by the defense that cannot be challenged in Issue 1. Can I ask you a question? Of course. What evidence was there that linked this gun to the defendant? Jones testified that the gun was his, that she'd seen him with it. The gun was found in a black bag where Jones sat on the defendant's side of the closet. But there was a vague reference in the briefs that there were some belongings of his in the bag. Do you know what those were? I do. A set of binoculars, a lighter, a flashlight. Nothing with his prints or his name or anything on it that anybody could connect him to this particular gun. Did I read that correctly, though? There was no evidence of fingerprints, Your Honor. There was no evidence of anything that tied him specifically to the gun that I could see, and I just want to make sure I didn't miss anything. Right. Well, Your Honor, I'd also note that in addition to Jones' testimony, and she did testify that those other items belonged to him, but also the State presented the testimony of Trooper Schultz, who testified that Jones did not know that the apartment was going to be searched that day. In fact, she didn't know that the police were going to be called. What happened, Your Honor? The facts are laid out in the People's Answer Brief is that Jones and her daughter had been discussing the option of talking to the police, but it was Jones' daughter who had called the police, I think, while Jones was at work. And while Jones was at work, she was visited by State Trooper Schultz, and then the search took place that same day. Jones was not in the apartment prior to that. And Schultz and Jones both testified that she did not know that the police were going to be called that day or searched the apartment that day. Ms. Camden, was there any testimony by the daughter that attempted to show his ownership or possession of that gun? I believe, Your Honor, that D'Anesio, I should check on this, I don't want to tell you the wrong thing, testified at the second trial, I know she testified at the first trial, and said that the bag looked like his. Just the bag, though, and I think I remember that from the brief. Yes, Your Honor. Not the bag she had seen him with before or something like that. Yes, Your Honor. She testified at the second trial that the bag looked like his bag, that it could be the same one. She also testified that it was his habit to use the bag like a woman would use her purse, that he carried the bag around a lot. Thank you, Ms. Camden. Mr. Evers? The daughter was not able to identify the bag. She was shown the bag by the police, and she was unable to identify it, and she did not identify it at trial. She did say that he carried around the bag, testified to that. That's about all. Defendant's property, Mr. Edwards' property, was in the bag, but that's not unusual, because, after all, he was living there and Jones was living there, and so the idea that she could very easily plant the gun in that bag and it had his property in it, I mean, that is something that a jury would have to struggle with and make a determination by. The State's position, just at rock bottom, is that you have to accept Jones' testimony as true, and any attack upon her credibility opens the door. I don't believe that that is the standard or should be the standard used for this jury trial. The first trial does demonstrate that the jury had to struggle with Jones' credibility, and the second jury simply should not have been permitted to listen to the things that were put forth by the State in an attempt in the guise of rehabilitation. The trial strategy that the State puts forward as what was done by the defense counsel, in the heat of the trial, I believe she just lost her way in the cross-examination and went too far, and I do not see how that is a trial strategy that should be sanctioned by this court. An effective assistance counsel is a very dangerous thing. There is the danger of unfair trials, and in this case, a trial counsel just went over the edge and brought out in the very first line of our brief for that issue, he fondled his own kit, that there's very little that is more explosive and dangerous than that. In terms of it coming out in this heated struggle by the trial, it's the unfortunate thing that sometimes happens. Consequently, on that point, we would also urge Your Honors to reverse and remand. If Your Honors have no other questions, thank you. Thank you.